**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**MELINDA SPURLOCK,**

**Plaintiff,**

**v.**                                                                **Case No.: 3:12-cv-2062**

**MICHAEL J. ASTRUE,
Commissioner of the Social
Security Administration,**

**Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. This case is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's motion to remand due to new and material evidence and the parties' cross motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 7, 8, 15).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned recommends that Plaintiff's Motion for

Judgment on the Pleadings and Motion to Remand be denied, the Commissioner's Motion for Judgment on the Pleadings be granted, and this case be dismissed, with prejudice, and removed from the docket of the Court.

## I.    <u>Procedural History</u>

Plaintiff, Melinda Spurlock (hereinafter "Claimant"), filed applications for SSI and DIB on November 2, 2006, alleging a disability onset date of July 13, 2006. (Tr. at 231, 236). Claimant reported difficulty due to nerve damage in her back and neck, as well as depression. (Tr. at 287). The Social Security Administration (hereinafter "SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 130-35, 139-43). Claimant filed a request for an administrative hearing, which was held on July 20, 2009 before the Honorable Robert D. Marcinkowski, Administrative Law Judge (hereinafter "ALJ"). (Tr. at 41-73). By written decision dated August 31, 2009, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 115-26). The Appeals Council remanded Claimant's case to the ALJ because the hearing decision did not contain an evaluation of the opinion of one of Claimant's treating physicians,[1] or adequately address records reflecting Claimant's Global Assessment of Functioning (GAF) scores.[2] (Tr. at 128-29). A second hearing was held before the same ALJ, (Tr. 74-103), who again found Claimant not disabled in a written decision dated February 24, 2011. (Tr. at 22-34). This decision became the final decision of the

---

[1] In particular, the Order of Remand indicated that the ALJ did not evaluate the opinion of James R. Phillips, M.D. However, as the ALJ notes in his second written decision, James Phillips is a Bachelor level therapist, not a psychologist or physician.

[2] The Global Assessment of Functioning ("GAF") Scale is a 100-point scale that rates "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," but "do[es] not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic Statistical Manual of Mental Disorders*, Americ. Psych. Assoc, 32 (4th Ed. 2002) ("DSM-IV"). On the GAF scale, a higher score correlates with a less severe impairment.

Commissioner on May 30, 2012, when the Appeals Council denied Claimant's request for review. (Tr. at 6-8). Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 1). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings, (ECF No. 5, 6), and both parties filed memoranda in support of judgment on the pleadings. (ECF Nos. 8, 15). Claimant also filed a Motion to Remand the case for the ALJ to consider new and material evidence, which the Commissioner opposes. (ECF Nos. 7, 15, 17).

## II.    Claimant's Background

Claimant was 39 years old at the time she filed her DIB and SSI applications and 43 years old at the time of her second administrative hearing. (Tr. at 78, 231). She has a high school equivalency diploma and communicates in English. (Tr. at 31, 78). Claimant has prior work experience as a sales associate and stocker for a department store and a server at a restaurant. (Tr. at 79, 278).

Claimant sustained a work-related injury in October 2004, for which she collected Workers' Compensation. (Tr. at 48-49). Since her injury, Claimant has experienced chronic pain in her neck, back, and throughout the left side of her body. (Tr. at 287). Claimant alleges that she became unable to work in July 2006 due to her severe left-sided pain and depression. (Tr. at 50-54, 287).

## III.    Summary of ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §

423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520, 416.920. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir.

4

1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the ALJ "must follow a special technique at every level in the administrative review." *Id.* §§ 404.1520a, 416.920a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. If such impairment exists, the ALJ documents the findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ

assesses the claimant's residual function. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3).  The

Regulation further specifies how the findings and conclusion reached in applying the

technique must be documented at the ALJ and Appeals Council levels as follows:

> The decision must show the significant history, including examination and
> laboratory findings, the functional limitations that were considered in
> reaching a conclusion about the severity of the mental impairment(s).  The
> decision must include a specific finding as to the degree of limitation in
> each functional areas described in paragraph (c) of this section.

*Id.* §§ 404.1520a(e)(2), 416.920a(e)(2).

In the present action, Claimant contests the ALJ's February 24, 2011 decision,

which became final following the Appeals Council's denial of review. (Tr. at 6, 22-34). In

this decision, the ALJ determined as a preliminary matter that Claimant met the insured

status for disability insurance through June 30, 2010. (Tr. at 24, Finding No. 1). At the

first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged

in substantial gainful activity since July 13, 2006, the alleged onset date of disability.

(*Id.*, Finding No. 2). At the second step, the ALJ determined that Claimant had the

following severe impairments: "a back disorder, left shoulder disorder, and an affective

disorder." (*Id.*, Finding No. 3). Under the third inquiry, the ALJ determined that

Claimant did not have an impairment or combination of impairments that met or

medically equaled any of the impairments contained in the Listing. (*Id.*, Finding No. 4).

Accordingly, the ALJ assessed Claimant's RFC, finding that Claimant had the residual

functional capacity to:

> perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a).
> The claimant can occasionally climb, balance, stoop, kneel, crouch, and
> crawl. She can never climb ropes, ladders, or scaffolds. The claimant has
> occasional limitations with: push/pull with left upper or left lower
> extremity; and, or perform overhead work using the left upper extremity.
> The claimant can occasionally use left upper extremity for gross
> manipulation. She must be able to sit and stand at will. She needs to avoid

> concentrated exposures to work place hazards and is limited to the performance of simple routine tasks on a sustained basis to have occasional interaction with others.

(Tr. at 25, Finding No. 5). Under the fourth step, the ALJ reviewed Claimant's past work experience, age, and education in combination with her RFC and determined that Claimant was unable to perform any past relevant work and transferability of job skills was not material to the determination of disability. (Tr. at 31, Finding Nos. 6-9). With the assistance of a vocational expert, the ALJ determined under Step 5 of the sequential evaluation process that Claimant could perform certain jobs at the unskilled sedentary exertional level, which were available in significant numbers in the national economy. (Tr. at 32, Finding No. 10). The ALJ found that Claimant was capable of performing the jobs of surveillance system monitor and call out operator. (*Id.*). Therefore, the ALJ concluded that Claimant was not disabled and, thus, was not entitled to benefits. (Tr. at 32, Finding No. 11).

## IV.    Claimant's Challenges to the Decision

Claimant raises three challenges to the Commissioner's decision. First, Claimant asserts that the ALJ did not properly evaluate her credibility. (ECF No. 8 at 5-15). Second, Claimant argues that the ALJ failed to properly weigh the opinions of her treating physician, Dr. Oregon Hunter. (*Id.* at 15-18). Finally, Claimant contends that the ALJ did not properly analyze her mental impairments; in particular, he failed to consider whether Claimant met Paragraph C criteria in Listing 12.04. (*Id.* at 18-20). Claimant also seeks to have her case remanded to the Commissioner in light of new and material evidence supporting her case. (ECF No. 7).

## V.    Relevant Evidence on the Record

The undersigned has reviewed the Transcript of Proceedings in its entirety,

7

including all of the medical records, as well as the "new and relevant" evidence that Claimant presents in support of her Motion to Remand, and summarizes below Claimant's medical treatment and evaluations to the extent that they are relevant to the issues in dispute.

### A. Relevant Treatment Records

#### 1. *Dr. Hunter of Southeastern Rehabilitation Medicine*

On September 8, 2005, Claimant sought treatment from Dr. Oregon Hunter at Southeastern Rehabilitation Medicine in Florida, complaining of pain on the left side of her body. (Tr. at 490). Dr. Hunter conducted a Comprehensive Medical Evaluation, which included a neuromusculoskeletal examination. (Tr. at 490-94). Dr. Hunter observed that Claimant "had a high level of pain behavior" and "moves stiffly," but there was "no acute distress" and she did not require an assistive device. (Tr. at 492). Dr. Hunter noted "rigidity and tenderness to palpation over the cervical, thoracic and lumbar paraspinous muscles" but "no tenderness to palpation over the upper and lower extremities" nor any joint instability. (*Id.*). Claimant also showed restricted range of motion in her neck and low back, but full range of motion in her upper and lower extremities. (*Id.*). Claimant's strength testing was 4/5 for both upper and lower extremities, though she reported neck and back pain with strength testing. (*Id.*). Dr. Hunter also noted that Claimant was oriented x3 but "seems depressed." (Tr. at 493). His diagnostic impressions included:

    1. chronic intractable pain syndrome;

    2. chronic neck and back pain, suspect degenerative disc disease;

    3. upper and lower extremity radicular symptoms; and

4. history of work-related injury 10/28/04. [3]

(*Id.*). Dr. Hunter recommended that Claimant limit her activity to "sedentary to light level of lifting and carrying," "frequent position changes," and "occasional stooping and bending, reaching and pushing." (Tr. at 494). Dr. Hunter also completed an Activity Level Estimation, in which he recommended the following activity restrictions: Claimant "must be able to make position changes as needed;" could only lift 1-10 lbs and 10-20 lbs occasionally; could use her right hand and foot for repetitive action, but not her left hand or foot; could only occasionally stoop/bend, squat, reach, push, and pull, and could never crawl or climb. (Tr. at 502). Dr. Hunter further indicated that Claimant was capable of full-time work, on a temporary basis. (*Id.*). He prescribed Lortab for Claimant's pain and told her to return for an EMG study or for follow-up within one month. (Tr. at 494).

Dr. Hunter met with Claimant four times in October 2005, (Tr. 479-89), after which he saw her approximately one time per month through June 2007. (Tr. at 406-23, 428-438, 444-56, 459-72, 474, 476-78, 503-07, 553-55, 557-65, 613). Between October 2005 and February 2006, medications decreased Claimant's pain and improved her function, although they required occasional adjustments. (Tr. at 445, 451, 454, 463, 467, 470, 476, 479, 485, 488). Claimant also tried aquatic therapy and epidural injections, which were not particularly effective in reducing her pain. (Tr. at 420, 424-27, 454, 459). During this period, Dr. Hunter recommended that Claimant begin an exercise program, which she did, (Tr. at 445, 450, 452), and made no changes to her activity status. (Tr. at 406, 450, 452, 455, 464, 465, 468, 471, 474, 477, 480, 483, 486, 489). In

---

[3] Dr. Hunter's impression also included histories of other past medical conditions and operations which are not relevant to the issues presented here. (Tr. at 493).

December 2005, Dr. Hunter started Claimant on antidepressants and referred her for psychological counseling, which she was unable to pursue due to a lack of funds. (Tr. at 459, 463, 467, 470, 474).

In March 2006, Claimant settled into a fairly stable medication regimen which included Percocet for musculoskeletal pain, Neurontin for neuropathic pain, Citalopram for mood disturbance, and Docusate periodically for constipation, which was a side effect of Percocet. (Tr. at 421, 431, 434, 436, 446, 450, 452, 455, 461, 505, 507). Claimant initially reported drowsiness as a side effect of Neurontin, which Dr. Hunter addressed by reducing Claimant's dosage and discontinuing her daytime doses. (Tr. at 430, 449, 451-52, 454). In September 2006, Dr. Hunter limited Claimant's activity status to "sedentary," (Tr. at 431, 434, 436, 561), though she continued with her exercise program. (Tr. at 430, 435, 504, 507, 557, 560, 613). Although Dr. Hunter occasionally increased Claimant's Percocet dosage in response to complaints of breakthrough pain, the medications were relatively helpful with her symptoms through January 2007. (Tr. at 430, 433, 504, 506-07, 560). In February 2007, Claimant reported drowsiness due to the Percocet, to which Dr. Hunter responded by switching her to hydrocodone. (Tr. at 560-61). In March 2007, Claimant switched to OxyContin for pain management, and in April 2007, Claimant reported "feel[ing] and function[ing] much better." (Tr. at 553-54). However, she ceased treatment with Dr. Hunter in June 2007, apparently due to financial hardship. (Tr. at 612-13).

In February 2008, Claimant resumed treatment with Dr. Hunter under largely unchanged circumstances. (Tr. at 612-13). Dr. Hunter diagnosed Claimant with chronic intractable pain syndrome; chronic neck and back pain; degenerative disc disease, cervical spine; bulges at C2-3, C3-4 and C4-5; upper and lower extremity radicular

symptoms; and left S1 radiculopathy. (Tr. at 612). Claimant reported self-medicating with Citalopram and that "her mood [was] currently stable." (Tr. at 612). Under vocational history, Dr. Hunter noted that Claimant was "not working. She is applying for Social Security Disability." (*Id.*). In subsequent visits, Dr. Hunter occasionally recorded under vocational history that Claimant was "disabled," but provided no further elaboration. (Tr. at 591, 598, 601, 605, 608). He continued to recommend a daily exercise program of walking and stretching for Claimant, which she apparently followed through April 2009. (Tr. at 577-78, 580-81, 586, 591, 597, 598-99, 601, 603, 605, 609, 694-95, 697-98, 703, 705-08, 711). During this time, Claimant resumed pain management with OxyContin, which was helpful in alleviating her symptoms, and continued to use Citalopram for mood disturbance. (Tr. at 591-92, 597-599, 601, 605, 608-09, 612). In September 2008, Dr. Hunter prescribed OxyIR for Claimant's breakthrough pain. (Tr. at 581). Beginning in October 2008, Claimant settled into a consistent medication regimen which included OxyContin for musculoskeletal pain, OxyIR for breakthrough pain, Citalopram for mood disturbance, and Tizanidine for muscle spasms. (Tr. 577-81, 694-95, 697-99, 702-12). Although Dr. Hunter managed Claimant's pain with occasional dosage increases, he documented that the medications were generally effective in reducing Claimant's pain and maintaining her function, at least through April 2009 and presumably for some time thereafter. (*Id.*). According to the evidence of record, Claimant did not return to Dr. Hunter's office between April 2009 and May 2010. (Tr. at 742).

Between May 2010 and November 2010, Claimant received monthly treatment from Dr. Hunter. (Tr. at 719-42). During this period, Claimant continued to experience pain in her neck, back, and left extremities. (*Id.*). Dr. Hunter treated Claimant with

11

"conservative" pain management, which included Oxycontin for pain and Tizanidine for spasms. (Tr. at 729, 732, 735, 738, 741). Dr. Hunter observed that the medication helped with Claimant's pain and function, (Tr. at 719, 728, 731, 734, 737, 740), while Claimant herself reported pain levels at 5, 6, and 7 on a 10-point pain scale. (Tr. at 728, 730, 731, 733, 736, 739, 740, 742).[4] Dr. Hunter encouraged Claimant to continue with her daily exercise program. (Tr. at 728-29, 738, 740-41). Dr. Hunter's last treatment note, dated November 4, 2010, indicates that Claimant had moved from Florida to West Virginia. (Tr. at 719).

### 2.  The Centers

On March 29, 2007, Claimant began psychological treatment at The Centers. (Tr. at 636). Therapist Nancy Lewis, MA, LMHC, conducted a Biopsychosocial Assessment of Claimant. (Tr. at 636-42). Claimant reported "experiencing depressive symptoms, headaches, feeling lonely, inadequate feelings, sleep problems, can't concentrate, depressed, fatigue, worthless feelings, [and] feeling inferior" following her 2004 work injury. (Tr. at 636). Ms. Lewis evaluated Claimant's Mental Status, observing the following: Appearance (walked slowly); Mood (depressed); Behavior (compliant, sat slowly-appears in pain); Affect (sad); Perceptual Disturbance (none reported); Thoughts (organized, recent memory impairment); Sleep (difficulty falling asleep, early waking); Judgment/Impulse Control (intact); Orientation (person, place, time); Appetite (no disturbance). (*Id.*). After interviewing Claimant regarding her health history, (Tr. at 637-41), Ms. Lewis issued a Provisional Diagnostic Impression: Axis I-Major Depressive Disorder, single episode; Axis II-(Diagnosis deferred); Axis III-Numerous medical

---

[4] In contrast, Claimant reported pain levels of 8 and 9 during the months when she ran out of OxyContin. (Tr. at 718, 719, 721).

problems including chronic pain; Axis IV-Psychosocial stressors-health problems, financial problems; Axis V-Current GAF score of 44.[5] (Tr. at 642). Similarly, Claimant's Problems List included: I-Depression; II-Chronic pain following injury in 2004; and III-Asthma, Urinary problems. (Tr. at 623).

Ms. Lewis also completed a Master Treatment Plan, which repeated the diagnosis and list of presenting complaints contained in the Biopsychosocial Assessment. (Tr. at 624). Ms. Lewis documented Claimant's strengths as "capable of independent living; ability to express feelings; insight/judgment; motivated for treatment; leisure skills and interests; positive marriage; and other-verbal," but listed Claimant's chronic pain on the left side of her body and difficulty driving as special needs/barriers to treatment. (*Id.*). Ms. Lewis described Claimant's longer-term goals as being "to decrease depressive symptoms, increase coping skills," and to "alleviate depressed mood and return to previous level of effective functioning," accompanied by a number of supporting short-term objectives for Claimant's treatment. (Tr. at 624-26).

Claimant met with counselor Maxine Farmer, BS, CCST, three times in April and May 2007, during which Claimant "presented herself well," seemed to be "very receptive to counseling," and appeared to be in a "good mood." (Tr. at 622, 653-55). However, she failed to follow up with any further appointments, and in October 2007, The Centers discharged her from the program for abandonning treatment. (Tr. at 621, 645, 651-52).

Claimant returned to The Centers on August 29, 2008, at which point she received a second Biopsychosocial Assessment and Master Treatment Plan, from counselor Deborah P. Scrambling, MS, LMHC, NCC. (Tr. at 616-20, 628-35). Claimant

---

[5] GAF scores between 41 and 50 indicate "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR serious difficulty in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." DSM-IV at 34.

reported being depressed all the time since her 2004 injury, and that she "wants to be in bed, to be alone, doesn't want to interact with others, when not on medication cries continuously;" "doesn't interact with [her husband] like she used to;" and "derives no pleasure from former activities." (Tr. at 628). Ms. Scrambling evaluated Claimant's Mental Status, observing the following: Appearance (appropriate); Mood (depressed); Behavior (compliant, speaking appears to be an effort); Affect (sad, flat); Perceptual Disturbance (none reported); Thoughts (organized); Sleep (insomnia); Judgment/Impulse Control (poor insight); Orientation (person, place, time); Appetite (no disturbance). (Tr. at 630). After interviewing Claimant regarding her physical and mental health history, (Tr. at 629-33), the evaluator issued a Provisional Diagnostic Impression: Axis I-Major Depressive Disorder; Axis II-(deferred); Axis III-Back, neck, leg, shoulder pain; Axis IV-finances, unemployed; Axis V-Current GAF score of 48. (Tr. at 634). Claimant's Problem List included: I-History of depression, crying, sadness, anhedonic, isolation; II-Unemployed. (Tr. at 617). In the Master Treatment Plan, Ms. Scrambling repeated her diagnosis and list of presenting complaints contained in the Biopsychosocial Assessment. (Tr. at 618). She described Claimant's strengths as "capable of independent living; ability to express feelings; ability to provide transportation; positive support network, and positive marriage," but documented Claimant's physical/medical needs as a barrier to treatment. (*Id.*). Ms. Scrambling described Claimant's long-term goal as reducing depressive symptoms and provided several supporting short-term objectives for Claimant's treatment. (Tr. at 616, 619).

Claimant met with a counselor three times in October and November 2008. (Tr. at 647-49). During each session, the counselor reported that Claimant's "mood was depressed with a flat affect," but she denied suicidal and homicidal intentions and was

14

oriented times three. (*Id.*). In a Treatment Plan Update dated October 23, 2008, Claimant's therapist re-assessed Claimant with: Axis I-Major depression; Axis II-(deferred); Axis III-Back pain; Axis IV-Financial; Axis V-GAF score of 49. (Tr. at 615). In November 2008, Claimant "stated that the loss of her job and her house were big triggering events in regard to her depression." (Tr. at 647). Claimant further "stated that her present pain causes some depression as well, but recognize[d] that her thought and beliefs contribute most to depression and she will work on restructuring these in terms of recovery." (*Id.*). Although Claimant was scheduled to meet with her counselor again in December 2008, treatment notes on the record again lapse following her November 2008 counseling session. (*Id.*).

In November 2009, Dr. Joseph Fishel, M.D. at The Centers conducted an initial Psychiatric Evaluation Assessment of Claimant, whose chief complaints were of severe depression and insomnia. (Tr. at 743-47). After reviewing her physical, mental, familial and social histories, (Tr. at 743-45), Dr. Fishel conducted a mental status examination of Claimant. (Tr. 745-46). Dr. Fishel observed that Claimant was oriented to time, place, person and situation; was alert and cooperative; her speech was normal; her thought process/content appeared intact; she appeared cognitively intact; her insight and judgment appeared to be good; and her concentration and attention were good with no problems with distractibility and short-term memory. (Tr. at 745). Dr. Fishel did note that Claimant's mood was anxious and depressed, her affect was restricted, and that she reported feelings of hopelessness and helplessness, but denied any suicidal or homicidal ideation. (*Id.*). Claimant's symptoms of depression included the following: insomnia at night; naps occurring approximately two times per week for one and a half to two hours; crying two to three times per day; feeling irritable frequently with little or no

provocation; having low frustration tolerance; having low energy; and experiencing low self-esteem and self-confidence. (Tr. at 745-46). Dr. Fishel then provided a Differential Diagnosis: Axis I-Major depressive disorder, recurrent, non-psychotic; generalized anxiety disorder by history; nicotine dependence; Axis II-(diagnosis deferred); Axis III-Bulging intervertebral disc disease; Axis IV- Psychosocial stressors; Axis V-GAF Score of 40.[6] (Tr. at 746). Accordingly, Dr. Fishel prescribed Claimant with Fluoxetine, an antidepressant, and Trazodone for depression/insomnia; referred her for individual psychotherapy; and scheduled a follow-up appointment for two months later. (Tr. at 747).

At her follow-up appointment in January 2010, Claimant "reportedly ha[d] done well on the Trazodone 300 mg at bedtime and Fluoxetine 20 mg in the morning" and reported that she had a good Christmas holiday spending time with her grandsons. (Tr. at 758). According to her Mental Status Examination, Claimant's mood was anxious, but other than that, she was orientated x4 and alert and cooperative; her speech was normal; affect was appropriate; thought process/content appeared intact with no evidence of any perceptual disturbances; cognitively, she appeared intact; and her insight and judgment appeared to be good. (*Id.*). Notably, Claimant "denied any feelings of hopelessness, helplessness, or intent to injure herself or others." (*Id.*). Dr. Fishel modified his differential diagnosis slightly, by adding "chronic pain syndrome" to Axis III, and raising Claimant's GAF score to 50 in Axis V. (*Id.*). Claimant's medications and dosage remained the same. (Tr. at 759).

---

[6] GAF scores between 31 and 40 indicate "Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR any major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." DSM-IV at 34.

At her next follow-up appointment in June 2010, Claimant's condition was largely unchanged: her differential diagnosis and medications remained the same, (Tr. at 755-56), as did her mental status, except that Claimant's mood was euthymic while her affect was restricted. (Tr. at 755). At the final follow-up appointment on record, dated November 12, 2010, Dr. A. V. Nanjundasamy, M.D. observed that "[t]he patient is doing well at this time." (Tr. at 753). Claimant also reported that "the medications are helping her and her depression has improved with the medication." (*Id.*). Dr. Nanjundasamy included the following Psychiatric Diagnosis: Axis I-Major depression, recurrent, moderate; Axis II-No diagnosis; Axis III-Chronic back and neck pain; Axis IV-Health and economic problems; Axis V-GAF Score of 55.[7] (*Id.*). Claimant's medication and dosage remained the same, although Dr. Nanjundasamy "encouraged [Claimant] not to take pain medication unnecessarily." (*Id.*). Dr. Nanjundasamy's records contain no mention of anxiety. (*Id.*).

### B. Consultative Evaluations

#### 1. Physical Assessments

On February 1, 2007, Dr. Samer Choksi, M.D., M.P.H. performed a medical examination of Claimant at the request of Disability Determination Services. (Tr. at 525-29). Dr. Choksi documented Claimant's primary complaints of "nerve damage to the neck and back" and depression. (Tr. at 525). In her history of present illness, Claimant reported her work-related injury in 2004 and the resulting chronic neck and low back pain, as well as left arm, shoulder, hand and leg pain. (*Id.*). She also reported suffering from depression stemming from the nerve damage to her neck and back and frustration

---

[7] GAF scores between 51 and 60 indicate "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 34.

with her resulting limitations. (*Id.*). Dr. Choksi then reviewed Claimant's past medical, surgical, and social histories. (Tr. at 525-26).

Dr. Choksi's physical examination of Claimant revealed no abnormalities in Claimant's HEENT (head, ears, eyes, nose and throat), heart and lungs, abdomen, or extremities, (Tr. at 526). Dr. Choksi examined Claimant's musculoskeletal system, including her neck, thoracolumbar, shoulders, elbows, forearm and wrist, hands, hips, knees, ankle, great toes, and gait. (Tr. at 527). Dr. Choksi acknowledged Claimant's complaints of "low back pain with left hip range of motion" but observed "no deformity, redness, heat, swelling, tenderness or other signs of inflammation." (Tr. at 528). He also noted limited cervical and lumbar range of motion and Claimant's complaints of "pain with extremes of cervical range of motion," but observed that "sensory and reflex findings are normal," there were "no muscle spasms noted" and "straight and seated leg raises were normal." (*Id.*). Claimant's strength was limited to 4/5 throughout, except for her left shoulder and left elbow strength, which were 3/5 and her left hip and left knee strength which were 3.5/5. (*Id.*) Claimant's gait and fine manipulation were both normal. (*Id.*).

Based upon Dr. Choksi's examination, state medical evaluator Dr. Karly Vaughan completed a Physical Residual Functional Capacity Assessment form on February 7, 2007. (Tr. at 530-37). Dr. Vaughan found that Claimant could occasionally lift/carry 20 pounds; frequently lift/carry up to 10 pounds; stand or walk six hours a day; sit for six hours a day; and was limited in upper extremities in her ability to push or pull. (Tr. at 531). Claimant's postural limitations allowed for only occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; and no climbing of ladder, rope, or scaffolds. (Tr. at 532). Dr. Vaughan found that Claimant was limited in

her ability to reach all directions and in gross manipulation, but unlimited in her fine manipulation and feeling. (Tr. at 533). Dr. Vaughan also found that Claimant was not subject to any visual, communicative, or environmental limitations, except that Claimant should avoid concentrated exposure to hazards. (Tr. at 533-34). Regarding the severity of Claimant's symptoms, Dr. Vaughan commented that Claimant's "subjective exceeds objective findings." (Tr. at 535).

On June 8, 2007, Dr. Robert Wesly, M.D., Ph.D. completed another Physical Residual Functional Capacity Assessment form, reaching conclusions similar to those of Dr. Vaughan. (Tr. at 566-73). Dr. Wesly found that Claimant could occasionally lift/carry 20 pounds, frequently lift/carry up to 10 pounds, stand or walk six hours a day, and sit for six hours a day. (Tr. at 567). Dr. Wesly found Claimant to be limited in both upper and lower extremities in her ability to push or pull. (*Id.*). He observed that Claimant "alleges 'constant pain, limiting her ADL's" but "still does laundry, drives." (*Id.*). Dr. Wesly's assessment with respect to Claimant's postural, manipulative, visual, communicative, and environmental limitations was identical to Dr. Vaughan's assessment. (Tr. at 568-70). Dr. Wesly also observed that Claimant's "symptoms appear to exceed objective findings," noting "min[imal] impairments documented on serial exams and imaging" and that Claimant's "diagnosis of 'radiculopathy' is not confirmed in the available MER." (Tr. at 571).

On December 15, 2008, Dr. Hunter completed a Medical Statement Regarding Illnesses, Physical Abilities and Limitations for Social Security. *(*Tr. at 659-60). Dr. Hunter included a brief description of Claimant's symptoms, most recent findings, diagnoses, and treatment, consistent with his treatment notes. (Tr. at 659). He then opined that Claimant suffered from pain that was severe, (Tr. at 660), but asserted that

19

Claimant could nevertheless: stand at one time for 30 minutes; sit at one time for 30 minutes; work for four hours per day; lift 20 pounds on an occasional basis; lift five pounds on a frequent basis; occasionally bend, stoop, balance, manipulate her left hand, and raise her left arm over shoulder level; frequently manipulate her right hand and raise her right arm over shoulder level; and that she never needed to elevate her legs during an eight hour workday. (Tr. at 659).

### 2. Mental Assessments

On January 20, 2007, Gary Honickman, Ph.D. performed a mental status evaluation of Claimant at the request of Disability Determination Services. (Tr. at 508-09). Dr. Honickman documented Claimant's primary complaints as "nerve damage in her back and neck, loss of strength in her hands and legs, and depression." (Tr. at 508). After briefly documenting Claimant's relevant background and family history, Dr. Honickman observed that "she was polite and exhibited no unusual mannerisms." (*Id.*). In his mental status examination, Dr. Honickman observed that Claimant's "mood and affect were felt to be mildly depressed" but otherwise "her thought processes were organized and her thought content was situationally appropriate." (*Id.*). Claimant informed Dr. Honickman that her depression began in 2004 following her injury, and that she "has problems staying asleep at night and has poor self esteem" and is "often fatigued." (Tr. at 509). She reported activities of daily living, which included having coffee, doing dishes or laundry, eating, and watching television. (*Id.*). Dr. Honickman diagnosed Claimant with Dysthymic Disorder, DSM IV 300.40.

On January 29, 2007, Dr. Steven Wise, Psy.D. completed a Psychiatric Review Technique of Claimant. (Tr. at 511-24). Dr. Wise diagnosed Claimant with Dysthymia, an affective disorder, (Tr. at 514), but determined her impairment to be "Not Severe."

(Tr. at 511). With respect to Claimant's functional limitations, Dr. Wise opined no restriction of activities of daily living, no difficulties in maintaining social functioning, and only mild difficulties in maintaining concentration, persistence, or pace. (Tr. at 521). Dr. Wise also found no episodes of decompensation. (*Id.*).

On April 17, 2007, Dr. Alejandro Vergara, M.D. completed a second Psychiatric Review Technique of Claimant. (Tr. at 539-52). Dr. Vergara diagnosed Claimant with "Dysthymia Disorder, mild," (Tr. at 542) and determined her impairment to be "Not Severe." (Tr. at 539). With respect to Claimant's functional limitations, Dr. Vergara opined mild limitations in Claimant's activities of daily living, no difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. (Tr. at 549). Dr. Vergara found no episodes of decompensation. (*Id.*). Dr. Vergara further stated that "taking into consideration all of the information in file, Claimant's mental condition is considered to be NOT severe. Disability if any, may be physical in nature." (Tr. at 551).

On December 15, 2008, James R. Phillips, BA, CCST completed a Medical Statement Concerning Depression with Anxiety, OCD, PTSD or Panic Disorder for Social Security Disability Claim. (Tr. at 656-58). Mr. Phillips listed Claimant's signs and symptoms as: anhedonia or pervasive loss of interest in almost all activities; sleep disturbance; decreased energy; and feelings of guilt or worthlessness. (Tr. at 656). Mr. Phillips opined that Claimant's restriction of activities of daily living and difficulty in maintaining social functioning was Moderate to Marked, (*Id.*), and that she experienced deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner. (*Id.*).

### C.  Family Care Medical Center Records

Attached to her Motion to Remand, Claimant provides medical treatment records from Family Care Medical Center dated May 25, June 20, July 12, August 4, and October 18 of 2011, and April 24, June 11, July 5 of 2012. (ECF No. 7-2).

In May 2011, Dr. Majester N. Abdul-Jalil, M.D. interviewed and examined Claimant. (ECF No. 7-2 at 1-2). Dr. Abdul-Jalil recorded Claimant's reports of lumbag0 (lower back pain) and major depressive disorder with anxiety, noting that Claimant "has had severe and incapacitating anxiety, which has her disabled at this time." (*Id.* at 1). Dr. Abdul-Jalil indicated that Claimant was "tolerating meds well at this time" and had "state[d] that she is doing well as [sic] this time." (*Id.*). Dr. Abdul-Jalil observed that Claimant had a "warm affect with wide range and with normal speech rate and prosody," had "good insight and congruent with stated mood," and that Claimant "appears less anxious than at her baseline." (*Id.*). Dr. Abdul-Jalil did comment that Claimant "had some difficulty waiting in the room, although she seems to have tolerated being in the full waiting room with less difficulty than in the past." (*Id.*).

In June 2011, Dr. Abdul-Jalil listed Claimant's chief complaints as "chronic lumbago with pain management in an opioid tolerant patient." (*Id.* at 3). He recorded Claimant's history of anxiety disability disorder, panic attacks, and comorbid agoraphobia, but observed that "at last visit she seemed far more comfortable in the waiting area amongst strangers than she has in previous visits when she'd have to wait in her car until it was time for her visit." (ECF No. 7-2 at 2). Dr. Adbul-Jalil cautioned Claimant against increasing the dose frequency of her pain medication, as doing so results in increased tolerance and the need to further increase dose frequency. (*Id.*). In July 2011, Dr. Abdul-Jalil reviewed Claimant's pain regimen in response to her request

to increase her Oxycodone dosage. (*Id.* at 4). Dr. Abdul-Jalil expressed concerns about "the pill burden and the risk of loss/theft of the volume of pills," but agreed to increase Claimant's medication dosage to accommodate her breakthrough pain. (*Id.* at 4). In August 2011, Claimant complained of some breakthrough pain, which had been manageable, but requested another dosage increase. (*Id.* at 5). Dr. Abdul-Jalil again expressed concerns about medication tolerance and made no changes to Claimant's medication plan. (*Id.* at 5).

In October 2011, Claimant requested "to have her meds broken into two halves, for less financial burden," and Dr. Abdul-Jalil obliged her. (ECF No. 7-2 at 6-8). Dr. Abdul-Jalil conducted a review of systems, during which Claimant reported symptoms consistent with "fibromyalgia at baseline." On physical examination, Dr. Abdul-Jalil observed that Claimant's "jaw [was] offset at times, connoting some nervousness, as she has anxiety disorder." (*Id.* at 6-7). Dr. Abdul-Jalil described Claimant as "mildly anxious, but able to have excellent recall" and noted that she "stood throught *[sic]* the visit." (*Id.* at 7). Dr. Abdul-Jalil ultimately diagnosed Claimant with chronic pain syndrome, allergy to other foods,[8] and lumbago. (*Id.*).

Following a six-month break in available records, Claimant returned to Family Care on April 24, 2012 to request a medication refill and also to report ear pain. (*Id.* at 9). Treating physician Dr. Randall Swain, M.D. reviewed Claimant's history of "large doses of narcotics for neck and back problems and fibromyalgia" as well as her history of depression. (*Id.* at 9). However, when asked, Claimant denied depression, anxiety, mood swings, and suicidal or homicidal ideations on that date. (ECF No. 7-2 at 9). In his

---

[8] Claimant also presented with a skin rash ("MP eruption" or "maculopapular eruption"), which "she stated that she gets . . . when she eats tomatoes." (ECF No. 7-2 at 6).

physical examination of Claimant, Dr. Swain made the following findings: Neck-supple, symmetric, no lymphadenopathy; Musculoskeletal-pos trigger point on neck and back, no evidence of acute neuro symptoms; neurologic-Cranial nerves II-XII grossly intact, patellar reflexes are normal, motor functions unimpaired; Psych-Normal mood and affect. (*Id.* at 9-10). Likewise, Claimant's HEENT (head, ears, eyes, throat, nose), cardiovascular, and respirator systems were unremarkable. (*Id.*). Dr. Swain advised Claimant that her medication "regimen wouldn't be continued here at clinic by anyone and should seek care elsewhere or be prepared to go without narcotics, taper prescription provided. Can go to TMH for detox if needed." (*Id.* at 10).

In June 2012, Claimant reported having pain throughout the left side of her body and having finished the last of her OxyCodone the morning of her visit. (*Id.* at 11). Dr. Gai Smythe, M.D. reported that Claimant had a "history of fibromyalgia, buldging *[sic]* disc, degenerative disc disease, radiculopathy, and chronic pain syndrome," and included in Claimant's past medical history: lumbago, major depressive disorder, chronic pain syndrome, generalized anxiety disorder, and allergy to other foods. (*Id.* at 11-12). In Claimant's physical examination, Dr. Smythe reported: "Constitutional-Alert and oriented x3, no apparent distress; Neurologic-Cranial nerves II-XII grossly intact, patellar reflexes are normal, motor functions unimpaired; Psych-Mood and affect mildly dramatic, augmented discomfort with walking in room, much smoother in hallway 'unobserved'; musculoskeletal-Right patellar DTR 1+ and Left 2+, Achilles DTR 2+ B/L, Seated SLRs neg, no LE edema or hyperalgesia of UE or LE." (ECF No. 7-2 at 12). Accordingly, Dr. Smythe assessed Claimant with lumbago; pain in limb; and other, pain disorder related to psychological factors, and questioned if Claimant suffered from somatization. (*Id.*). Dr. Smythe stated that Claimant "was to have come with chart info

24

from Dr. Abdul-Jalil [but] reports she hasn't been able to get hold of him. With history given, physical exam, lack of documentation. . . I would not continue her prior analgesic regimen." (*Id.*).

In July 2012, Claimant brought her records from Florida and requested an increase in Oxycodone dosage. (*Id.* at 14). In Claimant's physical exam, Dr. Smythe reported: Constitutional-Alert and oriented x3, no apparent distress; Neurologic-Cranial nerves II-XII grossly intact; and Psych-Normal mood and affect. (*Id.*). Claimant's HEENT, Cardiovascular, and Respiratory systems were also unremarkable. (*Id.*). Dr. Smythe assessed Claimant with "1) pain in limb; 2) backache, unspecified; [and] 3) other, pain disorder related to psychological factors-still UNCLEAR, patient brought progress notes from Florida but no testing studies." (ECF No. 7-2 at 15). Dr. Smythe remarked that Claimant "says several doctors have told her that her nerve damage could not be repairs *[sic]* but she knows nothing else and isn't sure if she's had an EMG. I've told her I doubted I would have her on the Florida and more recent med regimens regardless – at 44, if possible, need to find another way to address—once we know the problem." (*Id.*). Dr. Smythe also stated that she had "review[ed] all progress notes from 'Southeastern Rehabilitation' but no radiol included – did mention a trial of epidurals." (*Id.*).

## VI.   **Motion for Judgment on the Pleadings**

In reviewing Claimant's motion for judgment on the pleadings, the issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the totality of the record and determine whether sufficient evidence exists to support the conclusion of the Commissioner. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The decision for the Court to make is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001)). If substantial evidence exists, then the Court must affirm the decision of the Commissioner "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

Having thoroughly considered the evidence and the arguments of counsel, the undersigned rejects Claimant's challenges as lacking merit. Additionally, the undersigned **FINDS** that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

### A. Assessment of Claimant's Credibility

Claimant argues that the ALJ failed to comply with 20 C.F.R. §§ 404.1529, 416.929 when assessing the credibility of her statements about her symptoms. (ECF No. 8 at 6). Claimant argues that the ALJ: (1) failed to consider the extent of her limitations on "daily activities." (*Id.* at 6-8); (2) misread the "effectiveness" of her medication, and thus the extent of her pain, (*Id.* at 8-13); and (3) failed to consider "other factors," such as, Claimant's unsuccessful efforts to work in spite of "intractable severe pain," the

consistency of her medical records relating to her diagnoses, symptoms, and condition, and her full compliance with her treatment program. (*Id.* at 13-14). The Commissioner disagrees, arguing that the evaluations of Dr. Choksi, Dr. Honickman, and Dr. Wesly, as well as Claimant's own acknowledged capabilities and Dr. Hunter's records provide substantial evidence in support of the ALJ's credibility determination. (ECF No. 15 at 18-20).

In *Hines v. Barnhart,* the Fourth Circuit reiterated the well-established role of subjective evidence in proving the intensity, persistence, and disabling effects of pain, stating that "[b]ecause pain is not readily susceptible of objective proof. . . *the absence of objective medical evidence of the intensity, degree or functional effect of pain is not determinative."* 453 F.3d 559, 564-65 (4th Cir. 2006) (emphasis in original). Once an underlying condition capable of eliciting pain is established by objective medical evidence, disabling pain can be proven by subjective evidence alone. Of course, the extent to which an individual's statements can be relied upon as probative of the degree or functional effect of chronic pain depends upon the individual's credibility. "In basic terms, the credibility of an individual's statements about pain or other symptoms and their functional effects is the degree to which the statements can be believed and accepted as true." SSR 96-7p, 1996 WL 374186 *4. For that reason, the ALJ must assess and consider the credibility of the claimant when determining the weight to assign to her statements regarding the intensity, degree, or functional impact of pain.

Social Security Ruling 96-7p provides practical guidance on how the ALJ should evaluate a claimant's allegations of pain in order to determine its limiting effects on her ability to work. First, the ALJ must establish whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to

produce these symptoms. SSR 96-7p at *2. Once the ALJ finds that the conditions can be expected to produce the symptoms, the ALJ must consider whether the intensity, persistence, and severity of the pain can be established by objective medical evidence. *Id*. If the intensity, persistence or severity of the symptoms cannot be established by objective medical evidence, the ALJ must closely examine the claimant's statements about the disabling effects of pain and assess their reliability. *Id.*

In evaluating the intensity and persistence of a claimant's symptoms, including pain, the ALJ must consider "all of the available evidence." 20 C.F.R. §§ 416.929(c)(1), 404.1529(c)(1). Such evidence includes: the claimant's subjective complaints; claimant's medical history, medical signs, and laboratory findings. *See* 20 C.F.R. §§ 416.929(c)(1), 404.1529(c)(1); any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.), *See* 20 C.F.R. §§ 416.929(c)(2), 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, the location, duration, frequency and intensity of symptoms; precipitating and aggravating factors; any medical treatment taken to alleviate it; and other factors relating to functional limitations and restrictions. *See* 20 C.F.R. §§ 416.929(c)(3), 404.1529(c)(3); *See also Craig*, 76 F.3d at 595. In *Hines*, the Fourth Circuit Court of Appeals stated,

> [a]lthough a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). Thus, while the ALJ may not reject a claimant's allegations of intensity and persistence *solely* because there is a lack of objective medical evidence substantiating the allegations, the absence of objective medical evidence and the existence of conflicting evidence may be factors considered by the ALJ.

When reviewing an ALJ's credibility determinations, the court does not replace its own assessments for those of the ALJ; rather, the court reviews the evidence to determine if it is sufficient to support the ALJ's conclusions. "In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence ... or substitute its own judgment for that of the Commissioner." *Hays,* 907 F.2d. at 1456. Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989–990 (4th Cir. 1984) (citing *Tyler v. Weinberger*, 409 F. Supp. 776 (E.D. Va. 1976)).

Here, the ALJ provided a detailed overview of Claimant's testimony, which he compared against the evidence of record in order to assess Claimant's credibility. (Tr. at 28-30). Although he agreed that Claimant's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," the ALJ found that Claimant's "statements concerning the intensity, persistence, and limiting effects of these symptom are not credible" to the extent that they were inconsistent with his RFC assessment. (Tr. at 29). The ALJ observed that Claimant's "allegations and subjective symptoms [went] beyond what could be expected considering the objective laboratory and clinical findings." (*Id.*). The ALJ also found the evidence of Claimant's activities of daily living and the effects of her medications to be "inconsistent with her allegations of

incapacitating limitations or pain." (*Id.*). Accordingly, the ALJ determined Claimant to be only partially credible in her testimony regarding her pain and related symptoms. (*Id.*).

Claimant argues that after the ALJ determined that the severity of Claimant's alleged symptoms was not demonstrated by objective evidence alone, he then failed to properly consider and weigh the requisite factors relevant to her symptoms, pursuant to 20 C.F.R. §§ 404.1529(c)(3), 416.929(c). (ECF No. 8 at 5-6). Claimant takes particular issue with the ALJ's characterizations of her activities of daily living and the effects of her pain management medication, but also lists several other supporting factors which she believes the ALJ failed to properly consider. (*Id.* at 6-12).

### 1. *Activities of Daily Living*

With respect to her activities of daily living, the ALJ determined that Claimant was "able to take care of her personal needs," which included some cooking, light housekeeping, small loads of laundry, shopping, and traveling to appointments, (Tr. at 29). Claimant argues that "while the ALJ acknowledged some of the limitations on these activities, he ignored most and he failed to consider the myriad of other activities she could not do." (ECF No. 8 at 7). Claimant asserts that her daily activities were "even more limited than the ALJ's recitation suggests," (*Id.*), and that the "the record, taken as a whole. . . reveals no inconsistency" between the true extent of her daily activities and her testimony about her limitations. (*Id.* at 8). Claimant attempts to highlight "the qualifications [s]he recited about [her] activities and the activities [s]he could not do," (*Id.* at 7), but substantial evidence on the record supports the ALJ's description of her activities of daily living, even with the limiting caveats that Claimant emphasizes.

In her application for benefits, Claimant described a typical day, in which she

would "get out of bed, drink coffee, take a bath, take medication, cook something simple, wash a couple of dishes, watch TV, and go to sleep." (Tr. at 298). Other activities of daily living consisted of: cooking simple meals such as microwave dinners three times per week; doing a load of laundry once or twice a week; washing dishes three times per week; going outside once or twice per week; shopping once every 1-2 weeks, albeit with her husband's assistance; talking on the phone and visiting her daughter once per week; and attending doctor appointments. (Tr. at 296, 298, 300-02). However, Claimant did complain that everything she tried to do caused her pain, (Tr. at 297), and that bathing, dressing, and driving were difficult for her, as were housecleaning, yardwork or unloading groceries. (Tr. at 296, 299).

At her July 2009 administrative hearing, Claimant testified to driving about a mile and a half twice a month, (Tr. at 46), going into her husband's convenience store and making coffee twice per week, (Tr. at 48), watching videos, (Tr. at 56, 59), cooking one or two "quick and easy" dishes and microwaving meals, (Tr. at 56, 60), doing light loads of laundry with her husband's assistance in hanging the clothes, (Tr. at 56), wiping down counters occasionally, (Tr. at 57), feeding her dogs and cats, (Tr. at 60), grocery shopping with her husband every two to three weeks, (Tr. at 61), bathing and dressing, with her husband's help getting out of the bathtub, (*Id.*), and doing stretching exercises two to three times per week, (Tr. at 62). Although Claimant stated that she attended church occasionally, she had not attended in the past month and a half. (Tr. at 55). Likewise, she had not visited her daughter in about two months. (*Id.*).

At her 2011 administrative hearing, Claimant testified that she "ha[d] not driven at all in three years," (Tr. at 79), which was inconsistent with her earlier testimony at the 2009 hearing, (Tr. at 46), and a statement made to Dr. Hunter in June 2010. (Tr. at

737).  She also stated that due to her pain, she doesn't want visitors, doesn't want to cook, and can't clean because every time she tries, she hurts herself. (Tr. at 84). However, Claimant did testify to reading her Bible, and "try[ing] to get out four times a week and walk for half an hour" with her husband. (Tr. at 85).

Claimant's own statements and testimony about her day to day activities reveal that she was in fact able to do light cooking, (Tr. at 56, 60, 296, 300), light housekeeping chores, (Tr. at 56, 57, 60, 296, 298, 300), activities such as shopping, traveling, and going to appointments, (Tr. at 48, 296, 301, 302), and regular exercise, which included stretching and walking several times per week. (Tr. at 62, 85). Certainly, Claimant's activities of daily living were limited by her medical condition, a fact that the ALJ specifically acknowledged. (Tr. at 29). However, substantial evidence on the record reflects that Claimant engaged in a range of activities of daily living that, even subject to the qualifications she asserts, undermine her claims of incapacitating limitations or pain, consistent with the ALJ's credibility determination.

### 2.  *Effects of Medication*

Claimant argues that "the ALJ's assertion that she improved with medication is inaccurate especially with respect to her physical condition." (ECF No. 8 at 10). This is not the case. In her supporting brief, Claimant describes a number of medication changes occurring between 2004 and June 2006. (*Id.* at 8). However, the alleged onset date of Claimant's disability is July 13, 2006. (Tr. at 77). Although Claimant continued to experience pain and related symptoms between July 2006 and June 2010, the record is replete with references in Dr. Hunter's pain management treatment notes to Claimant's reports that the medications were helpful with her pain and function. (Tr. 430, 433, 504, 555, 560, 577, 579, 582, 591, 593, 598, 600, 605, 608, 612, 694, 696, 697,

698, 702, 704, 707, 709, 710, 712). Dr. Hunter periodically adjusted Claimant's medications in response to her complaints of decreased effectiveness, however these changes were generally followed by periods of increased helpfulness with pain and function. Between July 2006 and April 2007, Dr. Hunter increased Claimant's Percocet dosage twice, after which Claimant again reported that her medications were helpful with pain and function. (Tr. at 421, 430, 433, 504, 506-07, 553, 557-58, 560-61). Between March 2008 and April 2009, Claimant's Oxycontin increased only twice from 20 mg twice daily, to 40 mg twice daily. (Tr. at 602, 706). During this time, Dr. Hunter also prescribed Oxy IR as needed for breakthrough pain and Tizanidine as needed for spasms, but never increased the dosages. (Tr. at 581, 578). Throughout this time, Claimant continued to report that the medications were helpful with controlling her pain and function. (Tr. at 577, 579, 582, 591, 593, 598, 600, 605, 608, 694, 696, 697, 698, 702, 704, 707, 709, 710, 712). Between May and November 2010, Claimant was treated with OxyContin 60 mg three times per day and Tizanidine as needed, which she consistently reported were helpful with her pain and function. (Tr. at 719, 728-42). Likewise, treatment notes from Dr. Fishel and Dr. Nanjundasamy reflect that Claimant's antidepressants helped improve her mood and outlook. (Tr. at 753, 755, 758). As Claimant herself readily concedes, "[t]here is no question that her medications periodically helped her pain level as well as her depression level for that matter." (ECF No. 8 at 11).

Claimant also objects to the ALJ's observation that the side effects of her medication, namely drowsiness, "do not appear to interfere with her activities of daily living." (Id., quoting Tr. at 29). Although she points to several other side effects, including dizziness, nausea, and headaches, the only limitation that Claimant identifies

pertains to her ability to drive. (ECF No. 8 at 11). Even assuming Claimant's medications did limit her driving abilities, she offers no evidence or argument that her medications affected the myriad of other activities of daily living that Claimant testified to undertaking concurrently while taking her prescribed medications.

### 3. Other Relevant Factors

Claimant also highlights several other factors that the ALJ ignored, but which purportedly bolster her credibility: Claimant's unsuccessful attempts to work in spite of her pain; the consistency of her diagnoses among her treatment providers; the fact that her treatment providers never suggested she was "malingering, seeking drugs, or faking her symptoms;" her compliance with her treatment program; and her willingness to pursue injection therapy. (ECF No. 8 at 14). The undersigned regards the persuasiveness of these supportive factors as somewhat dubious. However, this Court is not tasked with conducting its own independent credibility assessment, but rather is constrained to review the ALJ's decision for substantial evidence on the record. *See Hays*, 907 F.2d at 1456. Here, the ALJ conducted a thorough analysis of the relevant evidence and provided a logical basis for the weight given to the relevant statements and opinions when crafting Claimant's RFC. Consequently, the Court **FINDS** that the ALJ followed the proper agency procedures in assessing credibility and weighing medical source opinions and his ultimate RFC finding was supported by substantial evidence.

### B. Consideration of Dr. Hunter's Opinions

Claimant broadly argues that the ALJ erroneously "failed to find Spurlock's chronic pain syndrome a severe impairment" and also "failed to assign weight to Dr. Hunter's opinion of disability." (ECF No. 8 at 15-18). More specifically, Claimant contends that the ALJ "committed reversible error by ignoring Dr. Hunter's diagnoses of

34

chronic pain syndrome ... and by ignoring the affect her psychological condition had on her physical impairments." (*Id.* at 17-18). In addition, Claimant complains that the ALJ failed to conduct a proper "treating physician analysis" when he neglected to assign weight to Dr. Hunter's opinion that Claimant was disabled. (*Id.* at 16-17). Neither criticism is justified.

Contrary to Claimant's contention, the ALJ accepted Dr. Hunter's opinion that Claimant had chronic pain and that the pain resulted in significant functional restriction. Although the ALJ did not specifically list "chronic pain syndrome" as a severe impairment, he unquestionably intended Claimant's persistent pain to be encompassed within the severe impairments that he did find for her, namely "a back disorder" and a "left shoulder disorder." (Tr. at 24). The ALJ noted that Claimant fell down some stairs at work and subsequently complained of pain in the neck, left shoulder, and back. (Tr. at 25). The ALJ thoroughly reviewed the medical imaging taken of Claimant's shoulder and spine over the years, as well as her EMG studies and her rheumatoid, ANA, and sedimentation results, all of which dealt directly with her chronic pain complaints. (Tr. at 25-26). In the course of determining Claimant's RFC with respect to her severe impairments, the ALJ devoted considerable energy to discussing Dr. Hunter's long-term pain management treatment notes, (Tr. at 26-28), comparing Claimant's statements and testimony regarding her pain and resulting limitations with the medical findings in the notes, (Tr. at 28-29), and assessing the extent to which Claimant's pain limited her functional capacity to work. (Tr. at 29). Moreover, the ALJ reviewed Dr. Hunter's documentation regarding Claimant's depression, expressly noting that Dr. Hunter prescribed an anti-depressant medication that alleviated some of Claimant's symptoms. Accordingly, the ALJ fully addressed Dr. Hunter's records and

accepted his medical findings and diagnoses. The ALJ also considered the substantive effect of Claimant's pain and depression on her ability to work. Consequently, he did not err by failing to adopt Dr. Hunter's label of "chronic pain syndrome" to describe Claimant's severe back and shoulder disorders.

In regard to Dr. Hunter's "opinion of disability," Claimant's argument is equally unavailing. Claimant posits that Dr. Hunter first expressed this opinion in March 2007 when he documented in an office record that she was disabled. In Claimant's view, that opinion was reiterated by Dr. Hunter in December 2008 when he stated that Claimant was capable of working only four hours out of an eight hour workday and again in an office record dated June 15, 2010.[9] Claimant argues that the ALJ erred by not giving those opinions controlling weight, or in the alternative, by failing to consider the factors set forth in 20 C.F.R. §§ 404.1527(c), 416.927(c) when weighing the opinions.

When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [her] receives." 20 C.F.R. §§ 404.1527(b), 416.927(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [her] symptoms, diagnosis and prognosis, what

---

[9] Frankly, the undersigned disagrees with Claimant and the ALJ regarding their interpretation of Dr. Hunter's office notes. In a section of the office notes entitled "Past Medical History, Vocational History, and Social History," Dr. Hunter documented "She is disabled" on March 2007 and June 15, 2010, among other dates. (Tr. at 504, 506, 588, 591, 598, 601, 605, 608, 702, 705, 707). However, on still other dates, he wrote "She is not employed" or "She is not working." (Tr. at 577, 580, 612, 728, 731). On June 25, 2007, Dr. Hunter wrote, "Her husband is not working," (Tr. at 613), while on July 8, 2008, he noted "She has applied for Social Security." (Tr. at 734). All of these notes are contained in the history section of the record, rather than the objective findings or diagnosis sections. For that reason, the undersigned does not interpret these notes to constitute opinions regarding Claimant's ability to work, but merely as summaries of Claimant's then current employment status. To the contrary, however, the undersigned agrees that the December 2008 medical statement does contain Dr. Hunter's opinions regarding Claimant's functional capacity and ability to work.

[she] can still do despite [her] impairment(s), and [her] physical or mental restrictions." *Id.* §§ 404.1527(a)(2), 416.927(a)(2).

The regulations outline how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. *Id.* §§ 404.1527(c), 416.927(c). In general, the ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source, and even greater weight to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* §§ 404.1527(c)(1)-(2), 416.927(c)(1)-(2). However, a treating physician's opinion on the nature and severity of an impairment is afforded ***controlling*** weight only if two conditions are met: (1) the opinion is well-supported by clinical and laboratory diagnostic techniques and (2) the opinion is not inconsistent with other substantial evidence. *Id.*

Claimant correctly states the general rule that a treating physician's opinion must be weighed against the record as a whole when determining a claimant's eligibility for benefits. As Claimant's emphasizes, a "finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected. It may still be entitled to deference and be adopted by the adjudicator." SSR 96-2p, 1996 WL 374188 *1. If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must analyze and weigh all the medical opinions of record, taking into account the following factors: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6). Generally, the more consistent a

physician's opinion is with the record as a whole, the greater the weight that will be given to it. *Id.* §§ 404.1527(c)(4), 416.927(c)(4).

When a treating physician's opinion is not supported by clinical findings or is inconsistent with other substantial evidence, the ALJ may give the physician's opinion less weight, *Mastro v. Apfel,* 270 F.3d 171, 178 (4th Cir. 2001), but must explain "specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record." SSR 96-2p at *5. The regulations do not state with specificity the extent to which the ALJ must explain the weight given to a treating source's opinion; however, Social Security Ruling 96-2p provides that the ALJ's decision "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* A minimal level of articulation is "essential for meaningful appellate review," given that "when the ALJ fails to mention rejected evidence, 'the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'" *Zblewski v. Schweiker,* 732 F.2d 75, 79 (7th Cir. 1984) (citing *Cotter v. Harris,* 642 F.2d 700, 705 (3rd Cir. 1981)). Nonetheless, an ALJ's failure to explicitly state the weight he gave to a particular medical opinion constitutes harmless error, so long as the weight given to the opinion is discernible from the decision and any grounds for discounting it are reasonably articulated. *See Dover v. Astrue*, 2012 WL 1416410 *5 (W.D.N.C. Mar. 19, 2012); *Smith v. Astrue*, 2012 WL 786944 *16 (D.S.C. Jan. 18, 2012); *McFalls v. Astrue*, 2011 WL 4565474 *8 (W.D.N.C. Sept. 29, 2011).

Notwithstanding these regulations and rulings, medical source statements on certain issues are treated differently than other medical source opinions. 20 C.F.R. §§404.1527(d), 416.927(d). The SSA explains that "opinions on some issues ... are not

38

medical opinions, as described in paragraph (a)(2) of this section, but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case." *Id.* Examples of opinions by medical sources that are treated as "administrative findings" include those regarding (1) whether an impairment meets or is equivalent to the Listing; (2) a claimant's residual functional capacity; (3) whether a claimant's RFC prevents him from doing past relevant work; (4) how vocational factors apply; and (5) whether a claimant is "disabled" or "unable to work." *Id.* Because the final responsibility for making these findings rests with the Commissioner, treating source opinions on issues reserved to the Commissioner are never entitled to controlling weight or even special significance. "Giving controlling weight to such opinions would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." SSR 96-5p at *3. Treating source statements on issues reserved to the Commissioner must not be ignored; rather, they must be evaluated in context with all the evidence in the case record. The ALJ should consider the supportability of these statements and their consistency with the record as a whole and explain the consideration given to the statements.  SSR 96-5p at *3-4.

In this case, while Claimant is correct that 20 C.F.R. §§ 404.1527, 416.927 state "the controlling standard[s] for evaluating the medical opinions" of treating physicians, (ECF No. 8 at 17, quoting *Stroup v. Apfel*, No. 96-1722, 2000 WL 216620 *5 (4th Cir. Feb. 24, 2000)), she fails to demonstrate that the ALJ misapplied the regulations and rulings in discounting Dr. Hunter's "opinion of disability." Dr. Hunter's opinions regarding Claimant's disability or inability to work constitute opinions on an issue

reserved to the Commissioner and, thus, are not entitled to controlling weight or special significance. *See* 20 C.F.R. §§ 404.1527(d) & 416.927(d). Although the ALJ did not explicitly assign weight to Dr. Hunter's "disability" opinions, the written decision makes it abundantly clear that while the ALJ gave significant weight to Dr. Hunter's December 2008 opinions regarding Claimant's functional capacities, the ALJ did not find Dr. Hunter's assertion that Claimant could only work four hours each day to be persuasive. (Tr. at 29-30). In the course of agreeing "that she could perform sedentary exertion with a sit/stand option as reported in December 2008 by Dr. Hunter," the ALJ observed that Claimant own testimony and the state agency physicians' opinions were consistent with that conclusion. (Tr. at 29-30). The ALJ rejected Dr. Hunter's finding of disability on the ground that it constituted an unexplained downgrade of Claimant's activity status that was inconsistent with the treatment notes, which reflected no corresponding changes in Claimant's abilities or in the effectiveness of her medications. (Tr. at 29). The ALJ noted that such a finding was also inconsistent with the medical evaluation of Dr. Choksi, (Tr. at 525-29), and the state agency RFC opinions of Dr. Vaughan, (Tr. at 530-37), and Dr. Wesly. (Tr. at 566-73). Claimant stresses the fact that Dr. Hunter "had been regularly treating Spurlock of approximately five years." (ECF No. 8 at 17). However, the length of the treatment relationship is only one factor in a host of factors for the ALJ to consider. Ultimately, it is the responsibility of the Commissioner, not the court, to evaluate the case, make findings of fact, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456 (4th Cir. 1990). Here, the ALJ considered the disability opinions in light of the remaining evidence and concluded that the opinions were neither consistent with nor supported by the record. Although Claimant disagrees with the ALJ's view of Dr. Hunter's disability opinion, the undersigned **FINDS** that the ALJ properly weighed all

of Dr. Hunter's opinions, provided a sufficiently specific explanation of his analysis, adequately resolved the conflicts in the opinions, and reached a determination that was supported by substantial evidence on the record.

## C.  Assessment of Claimant's Mental Impairment

Claimant asserts that the ALJ "failed to determine if [her] mental impairments satisfied the paragraph 'C' criteria of Listing 12.04" [10] and objects to the ALJ's rejection of the GAF scores her mental health providers assigned to her. (ECF No. 8 at 18). Both arguments are unpersuasive.

Claimant admits that "the ALJ could have concluded that the record did not support a 12.04(C) criteria disability finding" but argues that the ALJ committed reversible error by failing to specifically articulate the reasons for rejecting a disability finding under Section 12.04. (*Id.*). This argument is without merit, as the ALJ specified that he had "given particular consideration to the claimant's physical and mental impairments (see Sections 1.00 et seq., <u>Musculoskeletal System</u>; and 12.00, et seq., <u>Mental Disorders</u>)." (Tr. at 24). Although the ALJ found the Claimant's affective disorder was a severe impairment at Step 2 of the evaluation process, he found at Step 3 that Claimant's impairments did not match or equal any of the listed impairments in Sections 1.00 or 12.00. (*Id.*). The ALJ based this determination on the facts that "the

---

[10] Under Section 12.04(C) the required level of severity for "Affective Disorders" is met when the record reflects:

> Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
> 1. Repeated episodes of decompensation, each of extended duration; or
> 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
> 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.
> 20 C.F.R.  pt. 404, subpt. P, app. 1 § 12.04C.

medical evidence does not document listing-level severity, and no acceptable source has mentioned findings equivalent in severity to the criteria of any listed impairment, individually or in combination"; "no state agency reviewer/consultant/examiner has concluded that the claimant has an impairment(s) severe enough to meet or equal a listing"; and "no treating physician has credibly concluded that the claimant has an impairment or combination thereof severe enough to meet or equal a listing." (Tr. at 24-25). Moreover, as the Commissioner points out, "the record does not come even remotely close to establishing" that Claimant's impairments meet or medically equal the Paragraph C criteria under Listing 12.04. (ECF No. 15 at 21). Claimant had no episodes of decompensation of extended duration; no evidence suggesting that her mental state was so fragile that she teetered on the edge of an episode of decompensation; and no evidence that she required a "highly supportive living arrangement" in order to function. Claimant received only sporadic counseling, had never been hospitalized for a psychiatric illness, and had never required crisis intervention. Her mood was documented to be stable on medication alone.

Remand of a procedurally deficient decision is not necessary "absent a showing that the [complainant] has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." *Connor v. United States Civil Service Commission,* 721 F.2d 1054, 1056 (6th Cir. 1983). *See also Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result"). Our Court of Appeals, in a number of unpublished decisions, has taken the same approach. *See*, *e.g.*, *Bishop v. Barnhart*, No. 03-1657, 2003 WL 22383983, at *1 (4th Cir. Oct 20, 2003); *Camp v.*

*Massanari*, No. 01-1924, 2001 WL 1658913, at \*1 (4th Cir. Dec 27, 2001); *Spencer v. Chater*, No. 95-2171, 1996 WL 36907, at \*1 (4th Cir. Jan. 31, 1996). If the ALJ did err by failing to more fully explain his determination at Step 3 of the sequential process, that error was harmless because nothing in the record supports a finding that Claimant's affective disorder met Paragraph C criteria.

Claimant also objects to the ALJ's treatment of her mental health providers' opinions, and in particular their various GAF scores. (ECF No. 8 at 18-20). On March 29, 2007, Ms. Lewis, B.A. at The Centers assigned Claimant a GAF score of 44 in the course of completing Claimant's intake assessment and treatment plan. (Tr. at 642). On August 29, 2008, Ms. Scrambling, M.S. at The Centers assigned Claimant a GAF score of 48 in the course of completing a new intake assessment and treatment plan for Claimant. (Tr. at 634). On October 23, 2008, a Ph.D. level counselor at The Centers updated Claimant's treatment plan assigning her a GAF score of 49. (Tr. at 615). On November 17, 2009, Dr. Fishel, M.D. at The Centers assigned a GAF score of 40 in the course of conducting an initial psychiatric evaluation assessment. (Tr. at 746). On June 15, 2010, Dr. Fishel assigned Claimant a GAF score of 50 in her medical clinic progress notes. (Tr. at 755). On November 12, 2010, Dr. Nanjundasamy, M.D. at The Centers assigned Claimant a GAF score of 55 in her medication clinic progress notes. (Tr. at 753). Claimant argues that her GAF scores "reflect an opinion by these providers that she was totally disabled," which the ALJ improperly discounted. (*Id*).

As previously stated, the GAF Scale is a 100-point scale that rates "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," but "do[es] not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic Statistical Manual of Mental Disorders*,

43

Americ. Psych. Assoc, 32 (4th Ed. 2002) ("DSM-IV"). GAF scores are "useful in planning treatment and measuring its impact, and in predicting outcome" DSM-IV at 32, but they do not directly address a patient's ability to perform work-related activities. *Love v. Astrue*, No. 3:11-cv-14-FDW-DSC, 2011 WL 4899989 *4 (W.D.N.C. Sept. 6, 2011) ("A GAF score is intended to be used in treatment decisions and may have little to no bearing on a plaintiff's occupational functioning."). The ALJ correctly observed that, "the Social Security Administration has declined to endorse the GAF scores for use in the Social Security disability programs, and has indicated that such scores have no direct correlation to the severity requirements of the mental disorders listings," under 65 Fed. Reg. 50746, 50765-65 (Aug. 21, 2000). (Tr. at 30). Nevertheless, courts will "consider a claimant's GAF scores along with all other relevant evidence of record." *Melvin v. Astrue*, 2012 WL 4447617 *5 (E.D.N.C. Jul. 3, 2012); *Crockett v. Astrue*, 2011 WL 2148815 *11 (W.D. Va. Jun. 1, 2011); *see also Smith v. Astrue*, 2012 WL 3156597 *15 (S.D.W.V. Aug. 3, 2012). Thus, "while a GAF score is relevant evidence, the ALJ is free to reject it if other contradictory evidence exists in the record, particularly where the examiner fails to provide adequate support for his conclusion." *Ashby v. Astrue*, 2011 WL 3163234 *21 (N.D.W.V. Jul. 5, 2011).

The ALJ reviewed Mr. Phillips's opinion, (Tr. at 28), but accorded little weight to it because he was "only a therapist and not a psychologist or psychiatrist," (Tr. at 30), and therefore not an "acceptable medical source" under the regulations. 20 C.F.R. §§ 404.1513(a), 416.913(a). This is consistent with SSR 06-03p, which provides that "[t]he fact that a medical opinion is from an 'acceptable medical source' is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an 'acceptable medical source' because. . . 'acceptable medical sources' are the most

qualified health care professionals." SSR 06-03p, 2006 WL 2329939 *5 (internal quotations omitted).  The ALJ further noted that "there are no progress notes to support such an extreme opinion," that Claimant's mental health treatment had been sporadic, and that later progress notes demonstrated that she was doing much better with medications. (Tr. at 30). This analysis is consistent with the relevant prescribed factors for considering opinion evidence. *See* SSR 06-03p, at *4.

The ALJ carefully reviewed the treatment notes from The Centers, (Tr. at 27-28), but  accorded little weight to the GAF assessments from The Centers because there was "very little longitudinal data to support these low assessments," and because her GAF scores did improve once she began consistent psychiatric treatment. (Tr. at 30). This is true, insomuch as the record shows that Claimant only met with treatment providers four times between March and May 2007, (Tr. 621-27, 636-46, 651-55, 688), four times between August and November 2008, (Tr. at 615, 628-35, 647-50), and four times between November 2009 and November 2010. (Tr. at 743-53, 755-60). Significantly, Claimant's three lowest GAF scores were assigned as part of her initial assessments at the outset of treatment, (Tr. at 634, 642, 746), whereas her final two GAF scores show Claimant's improvement with consistent psychiatric treatment and medication. (Tr. at 753, 755). The ALJ did not err in according discounting these intermittent opinions from The Centers, particularly as they were inconsistent with the opinions of both state agency psychologists who evaluated the severity of Claimant's mental impairment. (Tr. at 30).

Despite the state agency psychologists' opinions that Claimant's mental impairment was non-severe, the ALJ did find that her affective disorder was a severe impairment, undoubtedly based upon the records and opinions provided by Mr. Phillips

and The Centers. (Tr. 24, 30). The state agency psychologists further opined that Claimant had none to mild restrictions of activities of daily living; no difficulties maintaining social functioning; mild difficulties maintaining concentration, persistence or pact; and no evidence of episodes of decompensation. (Tr. at 30). In agreeing that Claimant had mild restrictions on activities of daily living, the ALJ observed that the state psychologist opinions were consistent with Claimant's description of her activities of daily living, and with treatment provider progress notes regarding her persistence and pace. (Tr. at 30-31). Accordingly, the ALJ limited Claimant to "unskilled work with occasional interaction with others." (Tr. at 31).

Claimant is clearly dissatisfied with the weight that the ALJ accorded to her mental health providers' opinions and his rationales for doing so. (*Id.*). However, the ALJ provided a thorough overview of the record as it pertains to Claimant's mental health treatment and evaluations, carefully considered the opinions, and clearly articulated legitimate reasons for discounting Claimant's mental health providers' opinions. Moreover, substantial evidence exists in the record to support the ALJ's findings. Therefore, the undersigned **FINDS** the record reflects that ALJ complied with SSR 06-6p and the applicable regulations concerning opinion evidence.

## VII.   <u>Motion to Remand Based on New and Relevant Evidence</u>

Claimant argues that her May 2011 to July 2012 treatment records from Family Care Medical Center constitute new and material evidence warranting remand pursuant to sentence six of 42 U.S.C. § 405(g). (ECF No. 7). She asserts that the ALJ "primarily found Spurlock not disabled because her symptoms and alleged limitations were excessive in light of the objective clinical evidence," (*Id.* at 3), and reasons that the new records would have bolstered her credibility because they "contain[] a diagnosis of

fibromyalgia which, by definition lacks supporting objective evidence." (*Id.*). Claimant also argues that the new evidence demonstrates that her anxiety and panic attacks were more disabling than the ALJ realized, thereby warranting remand. (*Id.*).

Title 42 U.S.C. § 405(g) provides that the Court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding. . ." 42 U.S.C. § 405(g). Remand to the Commissioner on the basis of newly discovered evidence is appropriate if four prerequisites are met:

> (1) the evidence must be relevant to the determination of disability at the time the application(s) was first filed; (2) the evidence must be material to the extent that the Commissioner's decision might reasonably have been different had the new evidence been before him; (3) there must be good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and (4) the claimant must make at least a general showing of the nature of the new evidence to the reviewing court.

*Miller v. Barnhart*, 64 Fed.Appx. 858, 859-06 (4th Cir. 2003); *see also* 42 U.S.C. § 405(g); *Borders v. Heckler,* 777 F.2d 954, 955 (4th Cir. 1985). Evidence is new if it is "neither duplicative nor cumulative," *Bradley v. Barnhart,* 463 F.Supp.2d 577, 581 (S.D.W.V. 2006). Evidence is material if it "bear[s] directly and substantially on the matter in dispute," and generates a "reasonable possibility that the new evidence would have changed the outcome of the determination." *Id.* at 579 (citing *Bruton v. Massanari,* 268 F.3d 824 (9th Cir. 2001)). Therefore, Claimant must demonstrate that the Family Care records constitute new evidence that is material to the question of whether she was disabled at the time her applications were filed and, certainly, no later than the date on which the ALJ's issued his decision denying benefits. If so, then Claimant must also provide good cause for not having produced this evidence to the

Commissioner during the pendency of Claimant's disability applications.

We need not reach the issue of good cause because Claimant has not satisfied the newness and materiality requirements for remand. Claimant's assertions that the Family Center records "reflect anxiety so severe that, at times, she would have to wait in her car prior to her appointments" and "provide a diagnosis of fibromyalgia" are simply incorrect. (ECF No. 7 at 2). On May 25, 2011, Dr. Abdul-Jalil documented, as part of Claimant's social history, that she had experienced episodes of severe and incapacitating anxiety triggered by crowds. (ECF 7-2 at 1). This notation by Dr. Abdul-Jalil was not a reflection of Claimant's psychological condition on that date, was not specific to any date in the past, and was not an objective finding, assessment, or diagnosis rendered by Dr. Abdul-Jalil. Instead, it was merely a subjective description of social history provided by the Claimant. Moreover, this description of anxiety was not markedly different than the description provided by Claimant at the administrative hearing in February 2011. At the hearing, Claimant's counsel questioned Claimant about panic attacks and anxiety she experienced when "being around too many people." (Tr. at 83). Claimant described her attacks, stating, "I shake all over and I have to get out of there, and I have to try to concentrate on stopping the shaking." (*Id.*) To avoid the attacks, Claimant testified that she tried "not to go out anymore than I absolutely, positively have to." (*Id.*). The ALJ considered Claimant's testimony regarding debilitating anxiety but discounted its accuracy based upon Claimant's descriptions of her activities, which included shopping, traveling, and attending appointments. Consequently, it is unlikely that this or similar notations in the Family Center records would have changed the Commissioner's decision.

On October 18, 2011, Dr. Abdul-Jalil noted for the first time "fibromyalgia at baseline" in his review of Claimant's musculoskeletal system. Once again, this notation was not specific to any date in the past and was not a diagnosis or assessment of Claimant's condition, but was included in the review of systems interview.[11] (ECF No. 7-2 at 6-7). Dr. Abdul-Jalil's actual diagnoses on that date included chronic pain syndrome, allergy to other foods, and lumbago, but not fibromyalgia.[12] (*Id.* at 7). Likewise, none of the remaining treatment records included a diagnosis or assessment of fibromyalgia. Indeed, Claimant's medical records do not contain the requisite findings to document that she suffered from the medically determinable impairment of fibromyalgia. *See* SSR 12-2p, 2012 WL 3104869. In Social Security Ruling 12-2p, the SSA explained that to establish the medically determinable impairment of fibromyalgia, a claimant must produce a physician diagnosis of fibromyalgia that is adequately supported by medical findings and is not inconsistent with other evidence in the record. *Id.* at *2. Relying upon publications of the American College of Rheumatology, the SSA outlined two sets of criteria for diagnosing fibromyalgia, either of which would support a physician's opinion that the impairment was present. Essential to both sets of criteria are findings of widespread pain, "that is, pain in all quadrants of the body (the right and left sides of the body, both above and below the waist) and axial skeletal pain (the

---

[11] A review of systems is a screening tool that relies on a patient's verbal history and consists of an inventory of the body systems. McGraw-Hill Concise Dictionary of Modern Medicine. © 2002 by The McGraw-Hill Companies, Inc. When conducting a review of systems, the medical provider poses to the patient a series of questions, arranged by organ system, that are designed to elicit the patient's signs and symptoms and uncover dysfunction or disease. The review of systems does not represent the medical provider's diagnosis, but provides information useful in making that assessment.

[12] Fibromyalgia is a common syndrome in which a person has long-term, body-wide pain and tenderness in the joints, muscles, tendons, and other soft tissues. *PubMed Health,* National Center for Biotechnology Information, U.S. National Library of Medicine © 2012, A.D.A.M., Inc.

cervical spine, anterior chest, thoracic spine, or low back)—that has persisted (or that persisted) for at least three months," and evidence that other disorders that could cause the symptoms and signs had been excluded.  *Id.* at *2-3. In this case, Claimant's pain was chronic, but not widespread. The medical records and Claimant's testimony indicate that Claimant's pain was largely localized to her left side. (Tr. at 86-89) In addition, causes for Claimant's pain other than fibromyalgia were not ruled out. The medical records confirm that Claimant suffered from degenerative disc disease and had three bulging discs, which could account for the majority of her pain. (Tr. at 414). Even as late as July 2012, Claimant attributed her chronic pain to "nerve damage" while her treating physicians were suspicious that Claimant's pain was the result of drug tolerance, somatization, or psychological factors. (ECF No. 7-2 at 10, 12, 15). Given the lack of supportive findings of fibromyalgia and the presence of other conditions known to cause chronic musculoskeletal pain, it is unlikely that the Commissioner would have changed his decision.

Finally, contrary to Claimant's view, the Family Center records do not undermine the ALJ's determination; rather, they support the ultimate conclusion that Claimant was not disabled. In regard to Claimant's affective disorder, the records reflect improvement in Claimant's overall mood and outlook. In October 2011, Dr. Abdul-Jalil observed Claimant's "jaw offset at times, connoting some nervousness, as she has anxiety disorder," but described Claimant as "mildly anxious, but able to have excellent recall." (*Id.* at 6-7). In April 2012, Claimant denied experiencing "depression, anxiety, mood swings, suicidal or homicidal ideations" and Dr. Swain observed "normal mood and affect." (*Id.* at 9-10). In June 2012, Dr. Smythe documented Claimant's past medical history of "Generalized Anxiety disorder (added on Aug. 4, 2011)" and complaints of

anxiety, but observed that Claimant was "alert and oriented x3," and did not assess her with any anxiety related condition. (*Id.* at 11-12). In July 2012, Dr. Smythe observed Claimant's "normal mood and affect," but did not otherwise address Claimant's mental health. (ECF No. 7-2 at 14). Far from demonstrating disabling anxiety and panic attacks, the Family Care records appear to support the ALJ's finding that Claimant "has only mild limitations in social functioning." (Tr. at 30).

Similarly, the records indicate skepticism on the part of Claimant's treating physicians regarding the severity of her chronic pain. On April 24, 2012, Dr. Swain observed in Claimant's history of present illness that Claimant had been a private patient of Dr. Abdul-Jalil's and "was on large doses of narcotics for neck and back problems and fibromyalgia." (*Id.* at 9). However, in his physical examination of Claimant, Dr. Swain observed "pos trigger point on neck and back" but "no evidence of acute neuro symptoms," and reported Claimant's "cranial nerves II-XII grossly intact, patellar reflexes are normal, motor functions unimpaired." (*Id.*). Dr. Swain advised Claimant that her medication "regimen wouldn't be continued here at clinic by anyone and [she] should seek care elsewhere or be prepared to go without narcotics." (*Id.* at 10). On June 11, 2012, Dr. Smythe performed a physical examination of Claimant that yielded results similar to those of Dr. Swain. (*Id.* at 12). Dr. Smythe recorded that Claimant "augmented discomfort with walking in room" but was "much smoother in hallway" when she thought she was unobserved. (ECF No. 7-2 at 12). Further, Dr. Smythe stated that she "would not continue [Claimant's] prior analgesic regimen" in light of the history given, the physical examination, and the paucity of documentation demonstrating a need for significant pain medication. (*Id.*). On July 5, 2012, Dr. Smythe stated that she told Claimant "I doubted I would have her on the Florida and more

recent medication regimens" regardless of prior diagnoses because "at 44 [years old], if possible, need to find another way to address—once we know the problem" behind Claimant's pain. (*Id.* at 15). Rather than demonstrating a diagnosis of fibromyalgia or "chronic pain syndrome," these records imply a growing suspicion over Claimant's allegations of debilitating pain and a concern that Claimant was simply opioid dependent from years of taking medication. (ECF No. 7-2 at 3, 5, 10, 15). Ultimately, the records fail to bolster Claimant's credibility regarding the intensity and functional impact of her pain; particularly, as Claimant's physical examinations were consistent with the more mild limitations that the ALJ assigned to claimant in his RFC assessment.

In conclusion, the undersigned **FINDS** that the Family Care records do not provide substantially new or material information that would merit a sentence six remand.

## VIII.   <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the District Court confirm and accept the findings herein and **RECOMMENDS** that the District Court **GRANT** Defendant's Motion for Judgment on the Pleadings (ECF No. 15), **DENY** Plaintiff's Motion for Judgment on the Pleadings and Motion to Remand. (ECF Nos. 7, 8), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, The parties shall have fourteen days (filing of objections) and three days (mailing) from the

date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** January 28, 2013.

Cheryl A. Eifert
United States Magistrate Judge